IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JUNE 1999 SESSION

FILED

September 10, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9712-CC-00557 |
| | ) | |
| | ) | Wayne County |
| v. | ) | |
| | ) | Honorable Robert L. Jones, Judge |
| | ) | |
| BRYAN A. MILAM, | ) | (Two counts of first degree murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Lionel R. Barrett, Jr.
Washington Square Two, Suite 418
222 Second Avenue North
Nashville, TN 37206
(AT TRIAL AND ON APPEAL)

David L. Raybin
424 Church Street, Suite 2210
Nashville, Tennessee 37219
(ON APPEAL)

For the Appellee:

Paul G. Summers
Attorney General of Tennessee
      and
Daryl J. Brand
Associate Solicitor General
Criminal Justice Center
425 Fifth Avenue North
Nashville, TN 37243


T. Michael Bottoms
District Attorney General
Post Office Box 459
Lawrenceburg, TN 38464-0459

OPINION FILED:_____


REVERSED AND REMANDED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Bryan A. Milam, appeals as of right from his convictions by a jury in the Wayne County Circuit Court for two counts of first degree murder. He was sentenced to life imprisonment for each count, to be served concurrently in the Department of Correction. The defendant contends that (1) the evidence is insufficient to support his convictions, and (2) that the trial court erred in its instruction to the jury on release eligibility dates. We reverse the convictions and remand the case for a new trial because of the improper instruction to the jury on the defendant's release eligibility date.

At trial, Jaye McWilliams testified that between 7:00 p.m. and 7:18 p.m. on May 15, 1996, he heard a shot come from the residence of the defendant and the victim. He testified that after hearing the shot, a girl came running to his house and said, "Call 911. My brother has shot his wife." Mr. McWilliams testified that the Waynesboro Police Chief arrived after the child came over to his house. He said he saw the defendant carry his wife out of the house and ask for an ambulance.

Zachary Gobble, who was at the McWilliams' house, testified that he saw the defendant come out of his house and say, "Call 911." He testified that he also overheard a child say that her brother had shot his wife.

Edith Dixon testified that she was also at the McWilliams' house the night of the shooting. She testified that children ran in the house screaming, "daddy has shot mama and blood is running on the pillow," and that she tried to calm them down. Ms. Dixon testified that after the children came over, she heard another gunshot.

Waynesboro Police Chief Thomas Seitz testified that at 7:18 p.m. on May 15, he heard a dispatch regarding a shooting at the Milam house, and he said he arrived first on the scene. He testified that when he arrived, the defendant told him that the victim, who was seven months pregnant, had been shot. Chief Seitz said he entered the house and found the victim sitting on the couch, slumped over. He testified that a pistol was found approximately three feet from the victim and that she would not have been able to reach the gun if she had been sitting up straight.

Chief Seitz testified that he saw a large bullet hole in the victim's forehead and that he found the exit wound at the back of her neck. He said that in order for the bullet to travel in this pattern, the bullet would have followed a downward trajectory at a forty-five degree angle. He said the bullet went through the couch cushion and lodged inside the wall. He testified that the victim would have been sitting on the couch immediately before she was shot. Chief Seitz said that the defendant appeared hysterical at the scene.

Ernest Moyer, a friend of the defendant, testified that two or three days before the shooting, he and the defendant went canoeing on Buffalo River. He said that when the two returned from the trip, he overheard an argument between the defendant and the victim during which the defendant told the victim that he would "put a hole through you and that goddamn baby." Moyer testified that the defendant was pointing a gun at the victim. He stated that he took the Milams' two children outside the home while their parents argued.

Mr. Moyer acknowledged that he gave a statement to the Tennessee Bureau of Investigation (TBI) in which he said that the argument between the Milams happened before he and the defendant went canoeing. He testified that the Milams actually had two arguments and that he did not report this to the TBI.

3

TBI Agent Wayne Wesson testified that he went to the hospital and saw the bodies of Ms. Milam and her baby. Agent Wesson testified that Ms. Milam had an entry wound just below her hairline on her forehead and an exit wound at the back of her neck. Agent Wesson testified that his investigation revealed that the trajectory of the bullet was a downward forty-five degree angle. Agent Wesson testified that two shots were fired from the gun found at the scene. He said that he determined that the victim was sitting on the couch when she was shot. He stated that the evidence indicated that the second shot was fired after the defendant asked for 9-1-1 to be called.

Officer Byron Skelton testified that he arrived at the scene shortly after the shooting was reported and that he recovered the bullets. He testified that when he told the defendant that his wife was dead, the defendant became upset, dropped to his knees and began crying.

James Davis, a forensic scientist with the TBI, testified that he performed an analysis of the gunshot residue found on the victim's hands and on the defendant's shirt and pants. He said that the purpose of the test is to determine whether someone has handled or been near a gun when it was fired. He testified that the victim's test was inconclusive and that he could not rule out the possibility that she could have fired or handled a gun. He testified that he found gunshot residue on the defendant's clothing. He acknowledged that he did not receive a gunshot residue kit for the defendant's hands.

Agent Steve Scott, a special agent with the TBI in the field of firearms identification, testified that the gun used was a Jennings .9 millimeter pistol. He testified that the gun has a safety mechanism that is operative and that one must disengage the safety before firing the gun. He stated that the type of bullets used in the

4

shooting are quicker, faster and cleaner than other types of bullets, passing through objects more easily than standard lead bullets.

Dr. Donald Pope testified that he was at the hospital when the victim was brought in by ambulance. He testified that the defendant was upset and had to be removed from the emergency room. Dr. Pope testified that he knew Ms. Milam was going to die and that efforts were made to save the baby. He testified that an emergency cesarean section was performed, but the baby appeared to be dead when it was delivered.

Dr. Charles Harlan, the medical examiner, testified that he performed the autopsies of the victims. He testified that Ms. Milam had a tight contact gunshot wound to the forehead. He stated that the path the bullet traveled was a forty-five degree downward angle and that he observed a star-shaped pattern around the entry wound which signified that the muzzle of the gun was pressed tightly against the victim's forehead. He testified that she would have died within four to five minutes. He further testified that the death of the fetus would have occurred within five to ten minutes after Ms. Milam died. He testified that the fetus was fully developed and viable.

The defendant testified that he did not intentionally shoot his wife. He stated that about two weeks before the shooting, he and Ernest Moyer went canoeing on Buffalo River, but he stated that he never indicated that he wanted to shoot his wife or the baby. The defendant testified that on May 15, he spent the day moving furniture and washing a trailer. He said that at about 5:00 p.m., he went to Willy's Bar and had two beers. He said he called the victim from Willy's and asked her to pick him up. He said she arrived between 6:45 and 7:00 p.m. He testified that he planned to return to Willy's to sell his pistol and that when he got home, he retrieved the pistol from under the cushion of the living room sofa. He testified that the victim became upset and that

5

they began to argue. He said the victim grabbed the pistol from his back right pocket, and he tried to grab it back from her. He said a struggle ensued and the gun discharged.

The defendant testified that he called the operator after he told his sister to call the police. He stated that he did not take the safety off the gun. He acknowledged that he kept a second gun in the house and that he discarded it before the police arrived because it was illegal. He said that after the police and ambulance arrived, he went to the hospital and gave a statement to the authorities before he learned that his wife was dead.

The defendant testified that he kept the loaded pistol under the cushion in his house even though he had two small children in his home. He did not recall if the gun's safety was on while it was under the seat cushion. He testified that the victim grabbed the gun from his back pocket by the gun's handle and that a struggle for possession of the gun ensued. He could not recall telling an officer that the victim threatened to kill herself before pulling the trigger. He testified that he did not know why his children stated that he had shot the victim. He said he remembered throwing the illegal gun outside before the police arrived. The defendant admitted that he had previous convictions for the sale of marijuana.

Agent Wayne Wesson was recalled and testified that the defendant told him that the victim grabbed the pistol from his pocket and that the gun discharged accidentally. Agent Wesson also testified that the defendant told him the victim pulled the trigger but that the defendant could not remember where either his or her hands were during the struggle. He testified that the defendant told him that he threw his other gun in the woods after the victim was shot. Agent Wesson testified that the defendant was upset but that he was very uncooperative when the police asked to

6

swab his hands for gunshot residue. Agent Wesson stated that the defendant refused the test and would not speak to him after denying his request.

Bobby Jones, the owner of Crazy Horse Canoe Rental, testified that during May 1996, the defendant came once or twice to the facility. He said the defendant went canoeing on the river about one to two weeks before the shooting. Mr. Jones stated that he did not have paperwork for the defendant but that someone was with the defendant when he last went canoeing. Mr. Jones testified that he did not know the exact date when the defendant last went canoeing on the river.

Dr. Donald Pope was recalled and testified that the defendant told him that the victim was dead before the ambulance arrived. Dr. Pope stated that the defendant said the victim grabbed the gun.

Officer Byron Skelton was recalled and testified that the defendant told him he drank five beers at Willy's Bar and that his wife became angry when the defendant attempted to return to the bar. Officer Skelton testified that the defendant said the victim threatened to kill herself before the gun discharged. He also stated that the defendant told him the gun discharged twice, once when the victim was shot and once as it fell to the floor. Officer Skelton testified that he did not take notes of his discussion with the defendant and that the interview was about thirty minutes long.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions. He argues that Ernest Moyer's testimony was conflicting and that even if the testimony is true, the threat occurred several days before the shooting and is not sufficient to justify a finding of premeditation. The state contends that the evidence is sufficient. We agree.

The defendant is essentially asking us to reweigh the evidence. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).

The defendant was convicted of first degree murder, which is defined as the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1). "Intentional" is defined as a "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18). Premeditation requires "the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

In the light most favorable to the state, the evidence establishes that before the shooting, the defendant threatened to kill the victim and her unborn child. It shows that the victim suffered a tight contact gunshot wound to her forehead that was inflicted at a forty-five degree angle such that the bullet traveled in a downward trajectory. The defendant's assertion that the gun discharged during a mutual struggle could be rejected by the jury. We hold that the evidence is sufficient to support the defendant's conviction for first degree murder.

## II. INSTRUCTION ON RELEASE ELIGIBILITY

The defendant contends that the trial court erred in its instruction to the jury on his earliest release eligibility date. The record shows that the trial court instructed the jury that a person convicted of first degree murder would have to serve a

minimum of twenty-five years before the earliest release eligibility date. However, the defendant's actual earliest release eligibility date would be upon serving fifty-one years. See Tenn. Code Ann. § 40-35-501(i). Because we cannot conclude that the trial court's error was harmless, we believe that the error requires reversal and that the defendant is entitled to a new trial.

The defendant requested that the trial court instruct the jury on the earliest release eligibility date pursuant to Tenn. Code Ann. § 40-35-201(b)[1], which provides that "upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses." When such a charge is requested by either party, section (b)(2)(A)(i) provides:

> When a charge as to possible penalties has been requested pursuant to subdivision (b)(1), the judge shall also include in the instructions for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses. Such instruction shall include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date. Such calculation shall include such factors as the release eligibility percentage established by § 40-35-501, maximum and minimum sentence reduction credits authorized by § 41-21-236 and the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, if applicable.

Recently, in State v. Meyer, 994 S.W.2d 129 (Tenn. 1999), the Tennessee Supreme Court reversed and remanded a case in which the defendant was convicted of two counts of rape of a child. In Meyer, the trial court erroneously instructed the jury that the defendant would be eligible for release upon serving 5.73 years when the defendant would actually have to serve the entire sentence

---

[1]We note that effective May 18, 1998, the Tennessee General Assembly amended Tennessee Code Annotated § 40-35-201, deleting subsection (b) and replacing it with a new provision that provides that juries in noncapital cases shall not be instructed on the possible penalties for the offense charged or lesser included offenses. This amendment does not apply to cases tried before the effective date of the amendment. 1998 Tenn. Public Acts ch. 1041 § 2.

undiminished.  See Tenn. Code Ann. § 39-13-523(b).  The court held that the defendant was prejudiced by the erroneous jury instruction and that it was conceivable that the defendant would have been convicted of a lesser offense had the jury known that he would not have been eligible for early release.  See State v. Cook, 816 S.W.2d 322 (Tenn. 1992) (holding that the conviction should be reversed and remanded because the trial court erred by instructing the jury with regard to Range I sentences when harsher Range II sentences were applicable); State v. Reco R. Douglas, No. 02C01-9711-CR-00443, Shelby County (Tenn. Crim. App. Nov. 20, 1998) (holding that improper instruction that defendant convicted of first degree murder would be eligible for parole in less than twenty-five years required reversal).

In light of Meyer and Douglas, we agree with the defendant that he was prejudiced by the trial court's erroneous instruction.  It is conceivable that the defendant would have been convicted of a lesser offense had the jury known that he would not have been eligible for release for fifty-one years as opposed to twenty-five years.

In consideration of the foregoing and the record as a whole, we reverse the conviction and remand the case to the trial court for a new trial.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Joe G. Riley, Judge

_____
Alan E. Glenn, Judge

10